et al. Oral argument not to exceed 15 minutes for defendants and 15 minutes to make a motion.  This motion is to be shared by plaintiffs. Mr. Zachary Keller for the defendant appellant. May it please the court. Zachary Keller on behalf of the state defendants reserving three minutes for rebuttal. This court needs to look under the hood of this multi-million dollar fee award. It needs to examine the details because the details are adding up. Wait a minute. You mean we should have to go through each? You should have... How does an appellate court do that? Your Honor, you should examine the well-developed arguments that the state has put before you. To facilitate review, the state has organized plaintiffs' billing into 11 different categories and summarized their billing. Do I have to check to make sure you've been honest with the 11 categories? Your Honor, as Coulter recognized, fee challenges come in different shapes and sizes. We're not challenging the honesty of whether these hours were put in. Our challenges fall into the billing judgment category. And what Coulter says is this court needs to rely on its experience and examination of the record, which is what we're asking this court to do to decide whether the district court misapplied the billing judgment of the profession. Isn't the trial judge in the best decision to make those calls? And I'm not arguing that there can be a role for the appellate court, but the district court judge is the one who went through all the motions, worked, sat through the hearings, observed the submissions and the advocacy. So isn't that person really in the best position to make these calls? Your Honor, the abuse of discretion standard we're under certainly assumes that the district court is the closest to the case, and that's why it allows a zone of plausible decision-making rather than de novo review. But that does not exempt this court from its obligation to examine the record, particularly when you're before the court. Tell me where he abused his discretion. Since that's our standard, what discretion did he abuse? I think he abused the discretion both in misapplying attorney fee law to this fact and reaching a clear error of judgment and awarding over 6,000 hours in this case as per main case litigation that lasted only slightly over a year, Your Honor. But there were more than one lawyer involved. If it was one lawyer, I would agree with you, but there were many more than one lawyer. It was a pretty fast case that required a lot of attorney time. Where's the abuse of discretion? You still haven't told me. You started out saying we're not quarreling with the hours. I thought that was your first sentence. No, Your Honor, we're certainly quarreling with the hours. We think the court needs to look into the details in this case based on our well-developed challenges. Is there any law that says the appellate court looks through the details? Don't we rely on the district court unless you can show an abuse of discretion? Your Honor, Coulter says the way— Just let me say this. It's not an abuse of discretion because you don't like the hours or the money that's put in. What causes the abuse of discretion? Do you claim he didn't look at them, the hours, or he didn't make any— Your Honor, I think— I'm a little lost. I think it was an abuse of discretion for the district court to say that the state defendants were only raising conclusory allegations to this hours. We provided a detailed roadmap and overview that showed along every step of the way for each litigation task these attorneys overstaffed and overlawyered their projects. There's a snowball effect going on here, Your Honor. When you look at a billing entry, what might appear to be a reasonable billing entry for a reasonable task in isolation builds and builds when you keep adding layer upon layer of internal conferencing, editing, strategy conferences, researching. Let me ask you this question. When I looked at it, I thought this is an awful lot of lawyers and an awful lot of money, but the problem, as I see it from the judge's point of view below, is that this buildup was in connection with the 2012 election, as I understand it, and there wasn't all that much time left to fight the state, basically, and it was basically a partisan-type lawsuit. It was not only a lawsuit, a legal battle, but it seemed to be reflecting also a partisan battle in connection with the 2012 election, and the battle was about election law and the state was going to the heads of the Senate and the House and getting them to go over or they went over to the Supreme Court of Ohio all of a sudden, and so it was a big battle and it was mainly partisan. It looked like to me. Do you agree with that? I don't agree that the state defendants in this case should be being billed for litigation against other parties like the two Ohio legislatures that actually brought the state court action against the secretary who is now being billed for the hours, but I think that nothing about the nature of this case justified the type of hours and the lack of billing judgment we're seeing. We're seeing 13 attorneys spending 40 hours for a 40-minute telephone conference. Well, okay, counsel, I understand that point, but it still sounds like you're asking us to sort of parse that, and in answer to Judge Sirhindrick's question, you seem to be saying that the abuse of discretion by the judge is that the judge disagreed or rejected our argument, and that's not a classic abuse of discretion, is that? No, Your Honor, and I don't think that's what we're saying. I think what we're saying is under any level of professional judgment, when you look at the types of hours that were being billed in these cases, that fell outside of the district court's zone and range of plausible decision-making where it could find this was a reasonable fee. I also think there's... Going back to the point you just made, if you have a complex, fast-moving case, and I know you've quarreled with a number of people on the telephone call, the response seemed to have been that the issues were divided up, they required an immediate response, the duties were allocated, and so the people responsible for those issues had to be in the room listening so that they could immediately respond to those issues. That seems reasonable under the circumstances. Why is that not reasonable? Your Honor, I'd point the court to a comparison because this is certainly expedited litigation, but we also had two recent same-sex marriage cases in Ohio that were also expedited litigation, and we recently received the fee application for those cases. Those cases lasted longer, and they went all the way to the Supreme Court. Less than half the hours we're talking about in this case. That type of gap shouldn't be there. Also, if you look at Hunter, which was also expedited litigation, that case... Well, if they had charged twice as much as this group, you'd say this was reasonable? I think, Your Honor, the comparisons certainly allow us to give us a sense... I mean, if the comparison were they were more expensive, then you'd say this was reasonable. I think it would certainly give more credit to the idea that 6,000 hours in mostly six months of litigation is reasonable. 5,400 hours in this case were put in in a six-month time period. That is 30 hours every day, seven days a week, for an entire six months. This is beyond what you would expect lawyers to be putting in, even in an expedited litigation case. If you look at Hunter, that case involved very similar legal issues. It lasted longer than this case, and it also had a 12-day permanent injunction hearing. You feel like, and I feel like in some ways I'm arguing with you, but this is the argument that you made in the district court,  Yes, Your Honor. and the question is, in his rejection, just because you say it's too many hours, how do we know it's too many hours? The guy that presided over it said it's okay. Your Honor, the attorney fee case law, and I point the court to the Perdue decision, the whole purpose of the Lodestar method, and we're in the Lodestar method, there was no question of an upward adjustment here, is to cabin the discretion of trial judges so that there's adequate appellate review and so that we're not having fee awards based on subjective opinions about particular attorneys or a particular case. In this case, when you do comparisons to other cases, but also when you just look at the hours and apply the professional judgment of how much time should a task case. We have over 650 hours of just internal conferencing among attorneys in this case. Maybe we just talk beyond each other. You're really not answering my question. I apologize, Your Honor. I think the district court, to go back to why it's an abuse of discretion, this court has said in Gonto, you only get substantial discretion if you offer an adequate explanation. If you look at the district court's opinion, it wasn't engaging with the arguments we were making. There's very little discussion of the hour totals at issue, and I think the most telling part of the district court's order is the statement that we were relying on, the insinuation that we were relying on, the conclusory allegations. It's page nine of the opinion. The district court also... How much do you think we should cut back the hours? I think a 50% reduction is justified in this case. 50%? Absolutely, Your Honor. Get the devil out of it. Absolutely, Your Honor. I think that brings us in line with a very similar case like Hunter, where you had half the hours at issue in this case, even though it was longer litigation and had a 12-day... If it was longer litigation, that means you didn't have the same pressing deadlines that you had in this case. I would disagree with that, Your Honor. Hunter was an expedited litigation case. It lasted longer because you had a 12-day permanent injunction hearing on the back end, which is far beyond any proceeding that took place in either of these cases. The district court made some statements. It did say that all of these attorneys were necessary at the various conferences. District court stated at the outset it reviewed plaintiff's documentation and concluded that the hours were actually and reasonably expended in the cases. What do we do with that? Your Honor, for this extreme of a fee award, I don't think the type of formulaic statements that I've reviewed their records and they look reasonable is enough. I'd point the court to Ohio right to look reasonable. You said they were reasonable. They were actually and reasonably expended. Actually and reasonably expended. What do we do with that? That's the court's conclusion statement, Your Honor, but that's not showing that it engaged with the actual arguments we are making. I would point the court... Isn't that a finding, though? That's not a conclusion. That's a finding by the court that they're reasonable. That is a finding, Your Honor, but it's not showing that the court engaged with our arguments. I would point the court to Ohio right to life. There you had a 47-page report and recommendation by the magistrate judge that this court still found was not adequate explanation. That's because you were in an extreme situation. In that case, it was a large reduction. In this case, it's a very large fee award with over 5,400 hours coming within a six-month period. That type of total should raise eyebrows. That should lead to further review than basically what the district court did if you look through pages 8 and 9 of its opinion, which was essentially say, I've reviewed the hours, they look reasonable, and defendants are raising conclusory allegations. That's not what happened in this case. So if that's conclusory and that's not appropriate, I go back again to the position of my colleagues. How do we, as the appellate court, what do we look to to base a 50% reduction on? What do we have before us that would allow us to make that kind of a calculation? Wouldn't we have to, in effect, send it back to have the district court make that kind of adjustment? May I answer? I see my time is up. No, you wouldn't have to send it back. I'd point the court to the 11th Circuit decision in Barnes. In that case, the court recognized that you just had hours that were out of step with what professional judgment would allow. And if you look to page 151 of the Coulter decision, it said that that's how appellate courts are supposed to review this. They rely on their experience and their record to tell whether the reasonable billing practices of the professional were exercised. And Coulter made clear that there will be times when an across-the-board reduction has to be made. It's going to be abuse of discretion not to make a substantial across-the-board reduction. This is one of those cases, Your Honor. Thank you. Any other questions? Thank you. Good morning, Your Honors. I'm Stephen Berzon. I'm here representing the plaintiffs in the appellees in the SEIU Local 1 case and also the NEOC plaintiffs' appellees for the 2012 work in the NEOC case. Ms. Gupta will present an argument on behalf of the NEOC plaintiffs as well, including the 2013 work that we were not part of. Two law firms, two separate plaintiffs. Two answers to two questions. Why so many lawyers? One, why so many lawyers? Secondly, what about the market problem? Exactly, and I'll address both, Your Honor. The reason there were so many lawyers was, as Mr. Mordowski said in his uncontroverted declaration, this was an extraordinarily compressed, fast-paced, bet-the-country, as he called it, piece of litigation. It started with, on an emergency basis, we were called in, the need to go back to the district court and try to enjoin, one way or another, either through the All Writs Act or through a contempt motion, the attempt of the State of Ohio to defy a district court order which covered some of the votes in question by running to the state Supreme Court and trying to get an immediate decision. And in the Poynter case, which was issued a few weeks... Part of the case had to do with whether the electorate would be smaller or larger. That is, who would get to vote. That's correct. But to start with, there was a consent decree. A limited consent decree. But that consent decree would have allowed... It was kind of a partisan situation, wasn't it? Well, it was only partisan... I mean, we didn't consider it partisan for the reason we got in. It was a disenfranchisement... Democrats on one side and Republicans on the other, wasn't it? To the extent that the Ohio legislature and governor and secretary of state were Republican, that was true. But what they did was they ran into the state... The Democratic Party was a... I didn't represent them, but they were a party. I represented the unions that came into this case, one of which had been in the case beforehand, SEIU Local 1199. But the reason for so many lawyers was manyfold. First, we had to go to the district court, get the district court to enjoin a state court proceeding, and we had to do it right away because in this previous case, I think it was the Poynter case in the Supreme Court, they decided an original writ on the same issue, exempting this consent decree in three weeks. And they wanted an order to the secretary of state to defy the consent decree. So we prepared an intervention for the state Supreme Court. We ran into the district court. We had several telephone hearings that were lengthy. The reason we had so many lawyers on one hearing, I was on the call, was that we had a brief due the next day. The judge asked us to brief something by the next day. So then we filed the brief the next day. The judge issued the order, and then what happened? Were you involved in the litigation? Was it before the Ohio Supreme Court? No. I was brought in when there was an attempt to, my firm, when there was an attempt to defy the district court order that existed. From that point forward, after the judge issued his... After or before the effort in the Ohio Supreme Court? Before. When the effort started in the Ohio Supreme Court, we came in and we decided to use the All Writs Act and to file a contempt motion just as an alternative parallel theory, civil contempt, which we did. All right. So then it took another day of extreme pressure to get the state to withdraw, to follow the court order. We were on the phone with the district court. The district court ultimately had a call with the state Supreme Court clerk, and ultimately the state of Ohio did withdraw the petition in the state Supreme Court. But then Judge Marbley, to his credit, said, look, you've got a problem with my consent decree. Let's have an immediate proceeding to see if I should invalidate it. So then he set immediate motions and briefing on an intense schedule, intense schedule. There was one objection to two of my lawyers working all day on a Sunday and working virtually all night on May 26th. I remember the date because it's my daughter's birthday. And literally, that brief was due and filed on May 30th about why the consent decree should not be invalidated. So we were under extreme pressure there. There was an oral argument in Ohio on that. That was followed by an... It was prompted by the action in the Ohio Supreme Court. Correct. And by the fact that the state said, we don't have to follow this anymore. Secretary Bruner entered into this consent decree. She shouldn't have done it. We want to invalidate it. Well, we were trying to preserve it for a variety of reasons. But then we realized that the consent decree had flaws. What was the flaw? It only covered essentially the homeless and others without identification other than Social Security numbers. And there were photo ID and other requirements. So we wanted to extend the consent decree statewide to tens of thousands of provisional voters who were voting because of poll worker error in the right location, wrong precinct, because it was multi-precinct voting locations. So the reason we had a problem was Bush v. Gore would have invalidated, as the Sixth Circuit later indicated in this case, would have invalidated the consent decree for applying to some people a different standard than to other voters. So what did we do? We moved to modify the consent decree and extend it. But that had problems because it was a consent decree. But we argued it and fought it out. But at the same time, another case was brought that we handled, SEIU Local 1, which was the case that went up. And we moved for an immediate preliminary injunction. Now, there was briefing on not only both cases, and there were reasons both had to proceed because, one, we wanted to preserve the consent decree, which went beyond this issue. But, two, we might have lost the SEIU Local 1 case. Is it accurate to say that one of the reasons for so many lawyers in the case was that you were fighting a deadline of the 2012 election? Absolutely. And this all... Yes. And you, therefore, were under very strict time constraints. Absolutely. And Judge Marbley spent an extraordinary amount of time on this case. Did a magnificent job. And he wanted to get his decision in, and he wrote a 50-something-page merits decision, in time to get this case to the Sixth Circuit to allow this court to review the case. This court then had... It was extraordinary. This court had an incredibly rushed briefing schedule. And this court then had one hour of oral argument, done by telephone, but the state of Ohio had three lawyers argue it. I had one lawyer in my office, a younger partner, argue the case under my supervision. And then this court put out a 30-something-page opinion, which was the first case since Crawford, the only case since Crawford, to really find a statewide equal protection problem. How do you supervise an oral argument? I mean, who could supervise you right now? It's very hard right now, but two ways you supervise it. And we saved the state money by the fact that I didn't argue it, but I thought Ms. Leonard was ready. But would you interrupt the guy? No, of course not. But what I would do is two things, okay? One is I would work with her in preparing in advance. I would talk it through. I'd prepare a whole set of questions. I'd go back and forth. And then at the oral argument, it was by telephone. So if I needed to, it was not video, I could write a note as to a point to add, and I did. And it was very easy to do that. In this court, it's much more difficult. But frankly, if Ms. Leighton had something critical to say to me, I would have her write me a note now. I have a question that maybe you won't have to speak so loud about. One of the things that's a little perplexing is the amount that has been argued, is the amount of cost per hour, because you charge California hours, cost. It seems to me, then, that we must presume that you're experts, and that's why they brought you in from California, and that's why you want the higher rate. Is that a fair assumption? No. Well, it's probably fair. I think we were brought in because we were experts. But we agreed to charge Ohio. We were the experts. That kind of belies how many hours you should have to expend. Not in a case like this, Your Honor, number one. But number two, we build Ohio rates. And particularly when you're supervising another partner who is supposedly an expert. It saved the state money by the fact that I supervised another partner, I edited debriefs, worked out strategies, than if I had done it all myself. But secondly, we build Ohio rates. We went to various firms in the state of Ohio. We brought in Mr. Mordowski, who, in his supplemental declaration, laid out all the reasons he was expert, which Judge Marbley agreed with and relied on in his opinion, which was uncontroverted and whose deposition wasn't taken. And we build Ohio rates. The San Francisco rates were several hundred dollars more than we asked for. And then Judge Marbley cut those rates, and we're not challenging it, by 20%. So, no, we did not get San Francisco rates. We got good Ohio rates. We did not get Jones Day rates, although this case, I think, deserved that. And I think Judge Marbley was wrong there. But we did that. Secondly, we... Jones Day has got its own rates? Special to it? No, it doesn't. But its rates are commensurate with that of all the major firms in Columbus and Cleveland. Secondly, we build our client for this case. We actually build the client. The client doesn't just pay... I'll tell you, our clients in these 40 years of billing doesn't just pay bills. They review the bills. They analyze them. They paid for every one of those hours. We cut, in the time we went to the court, some of the time we actually billed the client to bend over backwards to show the court we're using billing judgment. We also wrote off 400 hours... This is reimbursement. Yes. Yes. We also cut 400 hours that we did not bill the client and we didn't ask this court for because we wanted to show we use billing judgment. And on the wrong location issue, which we lost in the Sixth Circuit but won in the district court, we could have billed for that because it was related litigation we chose not to. I want to stop you, and I just have a quick question for you. Counsel for the State has said that notwithstanding everything that you've said and written, there needs to be a substantial reduction. And he says this court should make that reduction for all the reasons he argued here. Assuming there should be some reduction made, whatever the percentage is, is that something this court has before it in the record the ability to do or should we send it back to the district? Well, I think if there had to be a reduction, it should go to the district court. But I take a huge umbrage at that in this case, Your Honor, because Judge Marbley did cut some time. He did cut the rates. We didn't bill for all kinds of time, including time we bill to our own clients. And Judge Marbley wrote a 31-page opinion. The declarations of Ms. Leonard and Ms. Layton lay out everything we did in the case and why. I understand that. And Mr. Mordowski. I understand you support the decision of Judge Marbley and the position. You're out of time, and I'm going to stop you. Thank you so much. May I say one more point? I did not get to argue the 3% rule. But you're out of time. You argued it in your brief. We did it in our brief. I would ask this court to satisfy you. And I agree with you. I wrote that opinion 30-something years ago, and time and the Gene case have made a big difference on that. I would just ask, Your Honors, to try to eliminate the conflict here. I would also close by saying this. This case, of all the Sixth Circuit cases, I believe the fee award in this case most closely resembles the situation, even though one case is 30 years and one case was compressed. But really does, in terms of the magnitude of the case and the kind of lawyering, resembles the Geyer case. And I think the court which applied for George Barrett, a wonderful lawyer, rates between $400 an hour between 1989 and 2001. You got paid a lot. I thought you were closing. Thank you, Your Honor. Thank you. Counsel. Oh, I'm sorry. We're going to still give you your full time. Thank you. May it please the Court. My name is Sandhya Gupta. I'm here today representing plaintiffs Northeast Ohio Coalition for the Homeless, Columbus Coalition for the Homeless, and specifically for purposes of the fees oral argument, the Ohio Democratic Party. These three groups who were involved only in the Neoc case were involved not only in the 2012 work that Mr. Berzon has discussed with your honors, but also in the 2013 work to extend the consent decree. I will add just a few points to those Mr. Berzon has already discussed, and because Mr. Berzon did not have an opportunity to discuss the Colter 3% rule, I may add a few points regarding that as well. On the direct appeal, the first point that I'd like to make is that the district court correctly awarded plaintiffs Neoc, CCH, and ODP their reasonable hours for the 2013 work extending the consent decree. You haven't been paid for those. Excuse me? Unlike Mr. Berzon, you haven't been paid from your client. That's correct. The client apparently is getting reimbursed because he was paid by his client. That's right. We have not been paid for that work, which took place in 2013. The district court gave a detailed explanation for why that work was reasonable. Given the substantial deference that the district court is due when there is such an explanation, we believe that there is no basis to find an abuse of discretion there. The second point I'd like to make is that with the exception of two attorneys' rates, which we are challenging here, the rates that the district court awarded to counsel for Neoc, ODP, and CCH for work in both 2012 and 2013 were reasonable. The firms presented evidence that this court has found to be probative of a reasonable rate, including that the rates were the firm's standard billing rates, that the rates were consistent with that of local practitioners in Cleveland and Columbus, and that the rates were consistent with prior fee awards, including those awarded in this case. Now, the exception to the reasonableness of the district court's award and part of our cross-appeal is the court's reduced rate award to Mr. McTighe and Mr. Chandra, which the court reduced Mr. McTighe's rate from 550 to 450, and Mr. Chandra's from 435 to 425. You're really challenging the $10 reduction. Now, that adjustment may seem small in the large scheme of things, but we raise the issue because we believe that the case presents an opportunity to clarify a standard. The evidence in the record shows that the rates are consistent with what other attorneys have been awarded in other cases, but more importantly, the unrebutted evidence in the record establishes that these are counsel's standard billing rates, and I want to explain that this court has long held that an attorney's standard billing rate is an efficient and fair shortcut for determining... So, doesn't that fall under the broad discretion of the trial judge to adjust where the judge sees fit in light of the overall efficiency and operation of the case? Sure. So, and we do greatly respect this district court. The reason why we believe that there's a problem with reducing an attorney's standard rate... Once you go down the line of saying there's a problem with his discretion regarding the amount of your fees, then suddenly you start to think maybe there's a problem with his discretion in everything. So, are you sure you want to make this argument? Well, again, it's not a huge deal, but I would like to point out the policy reason that we believe that the court should have provided more of an explanation regarding this particular issue, and that specifically is the following. When you have evidence that these billing rates are charged to fee-paying clients in similar types of cases, in civil rights cases... In those cases, the client can always negotiate with the lawyer about the rates, and in this kind of situation, that is not possible. There is no client to negotiate rates, and as the numbers go up in terms of hours, rates come down often. So, you know, it's... The problem is that the district judge knows so much more about this case than we can know if we spend 25 hours on it. He's lived with it for several years. Our concern is simply that when the court reduces the attorney's standard rate, it jeopardizes the ability of fee-paying clients who are paying that same rate to recoup what they have paid in those other civil rights cases, and it involves the district court interfering with the market rate that has been set, which creates a disincentive to lawyers choosing between fee-paying work and civil rights fee-shifting work, which is really the opposite of what Congress... So you're saying the judge abused his discretion in fixing your fees? I'm simply saying that... Isn't that what you're saying? No. Well, specifically regarding the reduction of that rate without providing an explanation for why the normal billing rate was not... Well, I understand you gave an explanation of why you say he abused his discretion, but nonetheless, that's... So if he abused it there, why hasn't he abused it with the amount of hours? Again, Your Honor... I mean, it seems to me you can't have it both ways. You can't say, well, he abused it one place, he didn't abuse it another. Fair enough. Fair enough. Your Honors, I would... The last point that I would like to make, because Mr. Berzon did not have an opportunity to get to the Coulter rule, and it sounds like Your Honors have acquainted yourselves with the briefing on the issue. I don't know what my colleagues think, but I wrote the opinions 30-some years ago, and the times have changed, and the Jean case is kind of to the contrary, and that case encourages more and more litigation over fees if the defendant doesn't have to pay for it. So my own view is, as in so many other cases I've written, I've changed my mind. I would like to give just one real-world example of how that rule works to deprive counsel of compensation for their successful work. But if the judge is saying he sort of changed his mind about that... That sounds fine, Your Honor. Thank you. Listening is a skill. Thank you. May it please the Court. I want to pick up on one of the questions that Judge Schorheinrich asked regarding the staffing hours combination viewed in full, and that's one of the major problems in this case is the top-heavy staffing. You not only have high hourly rates, you have lawyers charging high hourly rates,  the awarded rates do not reflect the normal type of billing pyramid you would see in a case staffed this heavily. Let me ask you this. You do agree that this litigation in the constitutional and in any sense of the word is important litigation. It's not the norm we get in damage lawsuits and other things. This is a, I mean, it could affect a presidential election outcome. I absolutely agree that civil rights litigation is important, Your Honor. And in this case, the vote in 2012 was pretty close in Ohio. So, I mean, you're talking about a situation that is not the ordinary run of litigation. One of the issues with that type of use to justify this fee award is that we are under the load start. What I meant is it's one of the reasons that everything had to be done so quickly and kind of at the last minute in connection with the election. Your Honor, Ohio's dealt with a lot of cases that deal with expedited litigation over elections. We've never seen a fee award like this. I would encourage the court to go look to the 10 other fee awards we charted. The sister counsel there, when she was attempting to justify why she had higher fees, gave us a policy argument as to why she thought the district court had abused its discretion. She contended that this would have a bad effect on civil rights lawyers, et cetera. You have not given us any reason why it's abused the discretion other than we should be appalled by the amount of hours or the rate charged. Other than that, where do we hang a hat? Absolutely, Your Honor. The underlying policy is that if you look at Purdue, the load start method is supposed to result in reasonably predictable fee results. And this is important to all sides of the party so that we know that we can settle fees without engaging in litigation, so that we know where we're at. If you look at the other Ohio election award cases, there is no reason this award should be $1.3 million higher than Hunter. There is no reason this award should be $900,000. That kind of comparison may be helpful to you because you are very familiar with it, apparently. But we don't know what happened in these other cases. We're not there. So that comparison is not very helpful, counsel. Your Honor, it's not just the comparison, though. It's the cumulative effect. Every step of this litigation, when you compare the hours to the actual work being performed, you get head-scratching totals. And there are limits to what abuse of discretion can shield. Abuse of discretion does not prevent this court from looking into the hours in this case. The only way this court will actually know. Look into the hours. The appellate court can't go down the billing rates. We don't have that kind of time, that ability, or anything like that. All we could do is say, gee, in our guts we think this is kind of high. Send it back and see if we can find a way to reduce it. And because the appellate court can't do that, Your Honor, that's why the state defendants of this case have done it for you. If you look at the Barnes case. And if you've taken the position you just made, and in your acknowledgement, if we can't do it that way, how can we possibly be in a position to accept your recommendation of a 50% reduction? I mean, we have nothing on which to base something like that. And you've given us nothing. It's just a random, arbitrary number. You don't have nothing. Your Honor, billing judgment arguments have to come down to a certain level of professional judgment. And the state isn't arguing for any bright line as to how many hours can be charged for a particular task. But 50% reduction. We are, Your Honor, and that's because. . . But the professional judgment has already been made by the district court. And then you want us to overturn his professional judgment, but you give us no reason why it was wrong other than, gee, it's high when you compare it to another case of which we have no idea what that case was. And this will be your final comment, so answer the question. I would disagree that there's no other reason. The district judge failed to perform an adequate analysis. If you compare the state's briefing in this case to the district judge's order, I would argue that it is impossible to tell actually what the state was arguing in this case. He just made no attempt to engage with arguments over preparation for briefs, attendance at conferences, out-of-state travel, five round trips from San Francisco to Columbus, even though there was no attempt under Haddox to justify out-of-state counsel. The devil is in the details in this case, and someone has to examine the details, and it has to be this court because the district court failed to. Counsel, we appreciate your argument, and the matter is submitted. Thank you very much. Thank you all.